Memorandum of Decision
On May 17, 1999, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Jackie H. and Deborah G. to their minor children, Andrew and Sandra H.[2] On March 17, 2000, the mother, Deborah G., filed a motion to revoke the commitment of the children to DCF. On April 11, 2000, the court granted the motion of the CT Page 9863 maternal grandparents, Philip and Jean W., to intervene for the limited purpose of appearing at trial and seeking a transfer of guardianship or other dispositional result. A consolidated seven day trial of these matters took place in this court between June 12 and 20, 2000. For the reasons stated below, the court now denies the termination petition against the mother, grants the termination petition against the father, denies the mother's motion to revoke the commitment, and denies without prejudice the relief sought in the maternal grandparents' motion to intervene.
FACTS
The court finds the following facts and credits the following evidence.
A. The Mother
The mother, Deborah S., was thirty-six years old at the time of trial. She completed high school in special education classes. The mother is limited intellectually and functions verbally in the mildly retarded range. She had a guardian ad litem throughout the trial. Recently, the mother has taken medication for depression. She receives a disability for a back problem and is currently a housewife.
Deborah married the father in 1989. From this marriage, Andrew was born on March 3, 1990 and Sandra was born on August 1, 1991. The mother became fearful of her husband because of his physically abusive behavior and filed for divorce in 1993. The couple entered into a divorce agreement in 1994 in which the father obtained sole custody of the children and the mother obtained rights to visit the children every weekend at the home of the maternal grandparents.[3] The mother exercised these visitation rights and stayed overnight on weekends with the maternal grandparents and her two children. The mother had a good relationship with the children.
Soon after the divorce, the mother married Ronald G. On November 14, 1995, the couple had a daughter, Stephanie G. Ronald G., however, had a criminal record for child molestation. DCF opened a case and referred the parents to services. DCF filed a neglect petition in October, 1995. Beginning in November, 1995, the mother, who was living in Newington at the time, regularly went to juvenile court for the case, making some ten appearances. DCF provided transportation. DCF obtained an order of temporary custody in February, 1996 and an adjudication of neglect in June, 1996. On October 28, 1997, the mother and Ronald G., both represented by counsel, consented to the termination of their parental rights to Stephanie. Stephanie was later adopted. CT Page 9864
DCF obtained an order of temporary custody (hereinafter "OTC") of Andrew and Sandra on November 4, 1996. The first DCF social worker to handle the case was Marlene Dennis, who had the case from October, 1996 to September, 1997. Dennis provided the mother written notice of the OTC hearing and two administrative case reviews. The mother did not attend these hearings. The court also provided the mother notice of approximately six court hearings over the next year. The mother did not appear in court. On October 31, 1997, the court adjudicated the children neglected, committed the children to DCF, and defaulted the mother for her failure to appear.
After the OTC, DCF placed Andrew with the maternal grandparents and Sandra with the paternal grandparents. Four days later DCF removed Andrew from the maternal grandparents because of a disclosure that, in 1982, the maternal grandfather was convicted of fourth degree sexual assault for an incident involving the mother. Unsupervised daytime visits with both Andrew and Sandra continued at the home of the maternal grandparents every week or every other week between December 25, 1996 and May 11, 1997. The visits went well but the mother did not attend.[4]
Although DCF changed the foster placements of Andrew and Sandra several times during this time period, Dennis did not provide the mother notice of these changes, contrary to written DCF policy. Dennis knew where the mother lived but, other than sending her several notices as described above, did not attempt to contact her. Dennis reasoned that the father had had full custody before the OTC and the mother had another case with DCF. As DCF stated in its 1999 social study: "When DCF became involved with [the father] in 1996, DCF did not provide reunification services to [the mother] as [the mother] did not reside with the children and [the mother] was not said children's guardian."
On April 29, 1997, the mother called Dennis and requested visitation with her children. Dennis replied that she would see if a visit could be arranged for the next week. The mother left her phone number. On May 14, 1997, the mother attended a visit with the children, the father, and both sets of grandparents at the children's therapeutic foster home. This visit was apparently the last visit that the mother had with her children.[5] The mother did not acknowledge holidays or birthdays with cards, gifts, or presents.
The next DCF social worker, John Skeene, had the case for only the two months between September, 1997 and November, 1997. Skeene and the mother did not attempt to contact each other and DCF thus did not offer the mother any services. DCF social worker Gary Saam took over the case in November, 1997. During his tenure, the mother was not receiving notices of court hearings, apparently because of the entry of the default. Saam CT Page 9865 was told by Skeene that the mother's role with her children was over when she became divorced. Indeed, Saam did not invite the mother to an administrative case review scheduled for April 3, 1998 because he mistakenly thought that the mother's rights to Andrew and Sandra had been terminated. On May 4, 1998, a DCF supervisor signed a summary of the administrative case review that stated: "Mother's parental rights terminated @ divorce."
Social worker Elsie Vazquez became the case worker on June 25, 1998. Vazquez conducted a search for the mother in connection with a study for an extension of commitment and possible petition for termination of parental rights. On August 3, 1998, Vazquez learned from the maternal grandparents that the mother was living in Uncasville. Vazquez then contacted the mother by phone and informed her about the status of the case. The mother's responses during the conversation were rambling, which Vazquez attributed to information that she had received that the mother was mentally retarded. The mother did say that she had not seen her children in a long time and that she missed them.
The mother was sent notice of the extension hearing and came to court on October 21, 1998. At the hearing, the court extended the commitment for one year but made no finding concerning the reasonableness of further efforts to reunify.[6] The mother applied for counsel and, on November 2, 1998, the court appointed counsel to represent her. The mother and her counsel attended court on November 16, 1998.
On November 17, the mother called a DCF supervisor and stated that she would like to work towards reunification because she was in the process of divorcing her current husband. The mother revealed that she planned to remarry thereafter. The next day, the mother called the Governor's office requesting that her visits resume. The Governor's office forwarded the message to DCF.
Vazquez learned of the inquiry and felt that the best way to assist the mother, given her mental deficits, was to have her come to court with an attorney. Vazquez offered the mother DCF transportation to court as long as she called sufficiently in advance. The mother did attend court with her attorney on December 9, 1998. Mother's counsel did not request that the court impose expectations for reunification but did request visitation.[7] DCF's response was to request an administrative hearing because the mother had not seen her children for quite some time and because, under the circumstances, it wanted a professional evaluation of the issue.
The mother did not attend two court appearances that took place on December 23, 1998 and January 29, 1999. Her attorney reported to DCF on CT Page 9866 February 16, 1999 that she was having difficulty reaching her client. But later that day, counsel called back stating that the mother was requesting visitation. Vazquez noted that she would discuss this issue at the next court appearance scheduled for February 22, 1999. The mother did not appear at this hearing or at the next two hearings that took place in April and May.
An administrative hearing on visitation took place on May 19, 1999 and the mother did attend. The hearing officer rendered a decision denying visitation on July 26, 1999. The basis of the decision was that the mother had not seen the children for the past two years, the children were at best apathetic about seeing their mother, and each child's therapist recommended against resuming visits.
The court reviewed the question of visitation on September 2, 1999. The court let the administrative decision stand with regard to visits but permitted the mother to have written contact with her children so that they might get a more positive image of the mother. With DCF's encouragement, the mother has now sent numerous affectionate cards and letters to her children.
The mother began a new relationship with Harold S. in November, 1998 and married him in April, 1999. Since their marriage, Harold was arrested, although not convicted, for an incident involving his son from a previous marriage, who lives with them, and for an altercation with a former girlfriend. The mother has attempted to be a stabilizing influence in the main age.
In September, 1999, a court-appointed psychologist conducted an interactional evaluation and rendered an opinion that the children showed little attachment to the mother. The evaluator concluded, based on that fact as well as the mother's limitations and the special needs of the children, that the mother did not appear capable of providing a home for the children in the foreseeable future. The mother acknowledges that she should not have custody of the children now. Her position is that they should be placed with the maternal grandparents.
B. The Maternal Grandparents
After the maternal grandfather's 1982 sexual assault conviction, the maternal grandparents and the mother obtained family counseling. The maternal grandfather, in particular, benefitted from the counseling and became more devoted to his family. Phillip and Jean W. have now been married for forty-two years. The maternal grandfather remains gainfully employed and the maternal grandmother is a housewife. CT Page 9867
There have been no improprieties in the visits with the children over the years. The children called them "Grampie" and "Grammie." After visits with the children at their home ended in May, 1997, the maternal grandparents continued to visit the children at other locations. Although they have not seen the children since August, 1997, the maternal grandparents continue to send the children gifts and letters.
After DCF removed Andrew from their care, the maternal grandparents filed a motion to intervene in the neglect proceedings for the purpose of regaining custody. A court-appointed evaluator recommended against placement because the grandparents tended to blame the daughter for the 1982 incident and the grandfather did not accept full responsibility. The court accordingly denied the motion for intervention on July 24, 1997. On February 18, 2000, after DCF petitioned for termination, the maternal grandparents filed the pending motion for intervention. Substantively, they are seeking a transfer of guardianship of the children. The maternal grandparents are also willing to adopt the children in the event of a termination of both parents' rights.
C. The Father
The father, Jackie H., was forty-one years old at the time of trial. He did not complete high school but later earned his GED. He had a difficult upbringing and was a troubled youth. As a teenager, the father began using alcohol and drugs. He entered a variety of treatment centers and psychiatric hospitals. When he was approximately twenty years old, he punched a doctor in the face.
Over the years, the father continued to receive psychiatric treatment, primarily for depression. The father has been arrested three times but there is no record of any convictions. A restraining or protective order was issued against him several years ago due to an alleged assault against his step-mother. He has a long work history and, at the time of trial, was gainfully employed. He began to recover from substance abuse in approximately 1989. He had a relapse and a nervous breakdown when the current proceedings began in 1996, but otherwise has remained clean and has regularly attended AA and NA meetings.
The father was a custodial parent of Andrew and Sandra until the OTC in November, 1996. DCF opened its case in June, 1996 because of a threat the father made to blow up the building of another state agency from which he was receiving assistance. The OTC arose because the father threatened to blow up a DCF building and kill himself if the State tried to take his children away. He also refused to submit to a substance abuse evaluation and was being evicted from his apartment. CT Page 9868
Over the next several years, the father made a variety of threats, direct and indirect, to blow up buildings or harm social workers. At one visit in 1997, the father made a threat in front of the children and a foster mother. Andrew then hid behind the social worker and Sandra moved away from the father. At another visit in 1998, the father used harsh and threatening language about DCF and its workers in front of the children and attempted to engage his children in conversations relating to his DCF case.
Although the father regularly attended visits with his children, DCF suspended visits on several occasions due to the father's threatening behavior. DCF ended all visits in May, 1998 because of the father's threats and because of his failure to provide proof of compliance with prescribed medication, individual mental health therapy, and a substance abuse evaluation, as well as failure to provide signed releases. The father supplied the releases in September, 1998. He moved in court for a resumption of visits but, on December 23, 1998, the court denied the motion.
At a psychological evaluation in August, 1999, the father got into a confrontation with a sheriff. The children, who had not seen their father for over a year, were afraid that the father would hurt someone else or get arrested. In February, 2000, the father engaged in telephone harassment of the case worker just prior to a scheduled court appearance. In May, 2000, the father called the most recent case worker and accused him and the prior worker of malfeasance. The father then called back to apologize for the verbal abuse.
The father's bombastic behavior continued during the trial of this case. After the father initially spoke out and made sounds expressing disapproval of some of the proceedings, the court advised the father that he was being disruptive and that the court could take courtroom demeanor into account. The father persisted with expressions of disapproval. He later walked out of court on two occasions making reference and veiled threats to seeing the Chief State's Attorney and several federal judges. The father later apologized for his conduct, which ceased during the second half of the trial.
The father moved approximately six times between October, 1997 and September, 1998, four more times in 1999, and several times in 2000. The father's moves have disrupted the visitation schedule, the coverage of the case by DCF, the father's mental health treatment, and the provision of special education to Andrew, which is based on his father's town of residence. The father admitted at trial that he currently does not have housing adequate for his two children. He expressed the hope that the children could be placed with the maternal grandparents. CT Page 9869
Over the last several years, the father has entered a variety of outpatient, inpatient, and partial hospitalization programs for his mental health. On several occasions, the father did not complete recommended after care. A partial hospitalization program that the father entered in late 1999 diagnosed the father with bipolar disorder with psychotic features. The father's medication compliance was erratic, as it has been in prior periods. As recently as March, 2000, the father was hospitalized for depression.
The father has participated in three court-ordered psychological evaluations. The evaluators have found that the father has a close bond with his children and that he is a psychological parent for them. On the other hand, the evaluators have found that the father is an angry man and that his anger poses a poor example for his children, who learn to respond to disagreements with threats. One of the evaluators, Dr. Robert D. Meier, recommended against returning the children to the father's care because he had not received any records or reports from the father establishing that he had complied with treatment that would address his unstable behavior. Another evaluator, Dr. David M. Mantell, summarized the matter as follows:
 [The father] presents as a chronically maladjusted man with both clinical and personality disorder and a poor potential to rehabilitate for the purpose of resuming custody of his children. This is most unfortunate since he seems to be genuinely attached to them and is so pained by their placement into foster care.
D. The Children
At the time of trial, Andrew was ten years old and Sandra was almost nine. Andrew is mildly retarded. He needs a structured environment with a set routine and ample assistance in his daily tasks. He has received such treatment from his current foster mother, with whom Andrew has resided since August, 1998. The foster mother has been actively involved in Andrew's special education needs. Andrew is very attached to the foster mother and calls her "Mom." There are three older children in the foster home and they regard Andrew as a younger sibling. The foster mother, who did not testify at trial, is committed to Andrew's long term foster care, but she is still assessing the possibility of adoption.
Sandra has been receiving therapy for several years, in part because of apparent sexual abuse by the paternal grandfather in late 1996 when the paternal grandparents provided relative foster care for her.[8] Sandra has lived in eight foster homes. She has been with her current foster CT Page 9870 parents since July, 1999. Sandra has done well there. She has had difficulties in school but the foster parents have devoted much time to helping her with assignments and providing enrichment activities. Sandra has a bond with the other two children in the foster home. She also enjoys seeing Andrew once a month.
Sandra calls her foster parents "Mom" and "Dad" and is attached to them. She has expressed a desire to be adopted by them. The foster parents appear attached to Sandra but have not committed themselves to adoption. They did not testify at trial.
Andrew and Sandra have expressed varying sentiments about seeing their biological parents. Recently, Andrew has not talked about his mother but has expressed a desire to see his father. Sandra has stated that she would like to see her mother once a year or so after she is adopted because she likes her mother and because she was nice when Sandra saw her at the most recent psychological evaluation. Sandra also stated that she would not like to see her father because it hurts her when he yells at people.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112
(c)(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with commitment extension hearings and permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112 (c)(1).
1. Prior Reasonable Efforts Findings
As stated, the court did not enter a reasonable efforts finding at or shortly after the first hearing on extension of commitment in this case on October 21, 1998. See note 6 supra and accompanying text. At the second extension hearing on October 21, 1999, Judge Patricia Harleston did make a finding that further efforts to reunify the children with the parents were not appropriate. This finding might have resolved the issue were it not for the claim that Judge Harleston had a conflict of interest. CT Page 9871
The record establishes that Judge Harleston appeared in juvenile court in her former position as an Assistant Attorney General representing DCF in Stephanie G.'s case on October 23, 1995 and January 12, 1996 and in Andrew's and Sandra's case on October 13 and December 11, 1996. These hearings were all of a preliminary nature involving advice of rights, entry of a plea, or a motion to intervene.
At a pretrial conference in this case in March, 1999, one of the attorneys raised the question of whether Judge Harleston had any prior involvement in the case. The court file from the early stages of the case was apparently not available at the time. Judge Harleston reportedly had no independent recollection of any prior involvement, which was understandable given the considerable lapse of time and the brief and routine extent of her prior role in the case.
With the benefit of perfect hindsight, it is clear now that Judge Harleston should have recused herself from presiding over the case in October, 1999. Canon 3(c)(1) of Code of Judicial Conduct provides that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where . . . (B) the judge served as a lawyer in the matter in controversy. . . ." "Even in the absence of actual bias, a judge must disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority." (Internal quotation marks omitted.)State v. Webb, 238 Conn. 389, 460-61, 680 A.2d 147 (1996).
General Statutes § 51-183d provides that [i]f a judge acts in any legal proceeding in which he is disqualified, the proceeding shall not by reason thereof be void, but such action shall constitute an irregularity of which advantage may be taken by appeal or, where no appeal lies, by proceedings in error." Even though in this case no one formally moved for Judge Harleston's recusal at the time, Judge Harleston understandably did not recall her prior involvement in the case, and there is absolutely no evidence of actual bias, this court believes, in view of the appearance of impropriety, that the best course of action is to disregard Judge Harleston's October, 1999 finding that reasonable efforts to reunify were no longer appropriate. Accordingly, this element remains a part of DCF's proof in this case.[9]
2. Reasonable Efforts Analysis
DCF did make reasonable efforts to reunify the father with his children. DCF provided supervised visitation with the children until the father's poor behavior and lack of cooperation with DCF warranted a CT Page 9872 cessation of visits. DCF also referred the father to substance abuse evaluations, numerous forms of mental health treatment, and three psychological evaluations. DCF continued to work with the father even though he threatened the agency and its workers. DCF thus met its statutory obligation in the father's case.
The mother's case calls for the opposite conclusion. Other than provide the mother written notice of court hearings, DCF did not make any efforts to locate the mother and reunify her with her children until social worker Elsie Vazquez took over the case in June, 1998. The prior social workers did not even attempt to speak to the mother. DCF did not follow its own policy requiring it to provide a parent notice of any change in the foster placement of his or her children.
DCF's explanations of its nonfeasance are completely inadequate. At the outset, DCF reasoned that reunification services were not required because the mother "did not reside with the children and [the mother] was not the children's guardian." Later DCF went so far as to state that the "Mother's parental rights [were] terminated [at her] divorce." The fact of the matter, which DCF should have fully understood, is that the mother's divorce neither deprived her of her legal guardian status nor terminated her parental rights. See generally General Statutes §45a-606.[10] The mother was a noncustodial divorced parent, but that did not diminish DCF's statutory obligation to "ma[k]e reasonable efforts to locate the parent and to reunify the child with the parent. . . ." General Statutes § 17a-112(c)(1). Indeed, many if not most DCF cases involve children with one noncustodial parent who never married the other parent. The mother in this case did not deserve less effort from DCF solely because, at the time she had her children, she was in the socially desirable state of being married. DCF's failure to recognize this fundamental point reveals a complete breakdown in its supervision and management of this case.
Once Vazquez took over the case in June, 1998, DCF did a better job. Vazquez located the mother and became the first DCF social worker in this case to perform the simple act of initiating phone contact with the mother. Vazquez encouraged the mother to come to court and obtain an attorney. Vazquez offered transportation assistance. Perhaps understandably, DCF could not agree to the mother's request for visitation because the mother had not seen her children for some time.
The only difficulty with Vazquez's efforts is that they came too late. DCF had failed in its obligations to the mother during the first twenty months of the case. This initial stage of the case was the critical one. It was during this time period that the children might have retained more of a bond with their mother through regular visitation and the mother CT Page 9873 would have been most able to rehabilitate. Viewing the matter in its entirety, DCF did not make reasonable efforts to locate the mother and reunite her with her children in this case.
3. Inability or Unwillingness to Benefit
General Statutes § 17a-112(c)(1) provides that the failure of DCF to make reasonable efforts is not fatal to its case if "the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." There is clearly some evidence to support the claim that the mother was unable or unwilling to benefit from reunification efforts. The mother understood enough to attend court in Stephanie's case and ultimately consented to the termination of her parental rights to Stephanie. Despite receiving written notices of court hearings in Andrew's and Sandra's case, the mother failed to attend court. The mother chose not to visit her children at the maternal grandparents' home for five months at the beginning of 1997. The mother did not acknowledge holidays or birthdays with cards, gifts, or presents. Additionally, even after Vazquez urged the mother to come to court and the mother did attend court in late 1998, the mother failed to appear for court hearings from late December, 1998 to May, 1999. Finally, one of the evaluators concluded, and to a large degree the mother herself concurred, that the mother is not currently capable of providing a home for the children.
On the other hand, there are also indications that the mother retained an interest in the case. The mother called DCF in April, 1997 and requested a visit, which she then attended. The mother called DCF and the Governor's office in November, 1998 to request reunification efforts or visitation. The mother came to court in November and December, 1998 and then from May, 1999 on. Finally, the mother has now sent numerous affectionate cards and letters to her children.
These competing points might neutralize each other were it not for the fact that the mother is limited intellectually and functions verbally in the mildly retarded range. As the Appellate Court noted in In re AntonyB., 54 Conn. App. 463, 735 A.2d 893 (1999), although mental impairment is not a per se defense to termination proceedings, DCF's obligation to make reasonable efforts at reunification "includes taking the parent's mental condition into consideration." Id., 473 n. 9. In the present case, DCF did not do so. Indeed, DCF did not take even the minimal step of attempting to call the mother during the first twenty months of the case. It is quite reasonable to believe that, if the mother early on had received the assistance that Vazquez eventually provided her and that the mother, given her limitations, clearly needed, the mother would have attended court and complied with other DCF expectations. Given DCF's failure to CT Page 9874 take the mother's mental condition into account in the first twenty months of this case, this court cannot conclude that the evidence clearly and convincingly establishes that the mother was unable or unwilling to benefit from reunification efforts. Because DCF has thus failed to prove the essential element of reasonable efforts, this court must deny the termination petition against the mother.
B. Statutory Grounds
To prevail in the termination case against the father, DCF must prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B., 49 Conn. App. 510, 512,714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112(c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
Because there were no amendments in this case, the adjudicatory date is May 17, 1999, the date of filing of the original petition. The sole ground alleged in the petition against the father is failure to rehabilitate. The court finds that DCF has proven this ground by clear and convincing evidence.
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1). No dispute exists that, on October 31, 1997, the court adjudicated the children to be neglected, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). This portion of the statute requires the court to analyze the parent's rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time.'"In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In reDanuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, CT Page 9875 however, does not require a parent "to be able to assume full responsibility for [a] child, unaided by available support systems." Inre Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
Under these standards, the father failed to rehabilitate during the adjudicatory period. His pattern of threatening to blow up buildings or harm social workers revealed his instability and his inability to deal with authority. Most distressing is that the father could not control himself in front of his own children. The father's behaviors were especially insensitive given that both children have special needs. While the father's misconduct may have stemmed from his own misguided affection for his children, the effect of his behavior was to instill fear in his children and to set the wrong example for them.
Contributing to the father's difficulties was the father's failure to complete recommended mental health after care and his erratic compliance with medication. His frequent moves to different residences compounded the task of obtaining proper therapy and of working with DCF and the children's foster placements. The sum of this evidence clearly and convincingly establishes that, during the adjudicatory period, the father did not achieve "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). Accordingly, DCF has proven failure to rehabilitate against the father.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The termination case against the father is unusual because the court has denied the termination petition against the mother and because there is no commitment by the foster parents of either child to adoption. In Andrew's case, the foster mother is at least committed to long term foster care, which is a statutorily sanctioned permanency plan. See General Statutes § 46b-129(k)(3)(D) In Sandra's case, it is disappointing that DCF has not been able to obtain a commitment to adopt despite Sandra's placement in her current foster parents for almost a year. Nevertheless, Sandra wants to be adopted by them and adoption remains a reasonable possibility. Further, both children are very attached to their foster parents and have received excellent care, CT Page 9876 especially in view of their special needs.
The best interest of the children favors terminating the natural father's parental rights to keep open the possibility, depending on the ultimate outcome of the mother's case, that the children will remain in their current foster homes permanently. The father is simply not a potential resource. He has not made any progress in conquering his problems since the end of the adjudicatory period. He still engages in angry and disruptive behavior. He still requires close mental health supervision and better medication compliance. He still cannot maintain a stable residence. The court-appointed evaluators all found that the father has significant behavioral problems. The father himself admits that he is not currently able to house his children. The father's love for his children is admirable, but this court must focus on the best interest of the children, not the father. Applying the proper test, termination of the father's rights is warranted.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes §17a-112(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168
(1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674, 691,741 A.2d 873 (1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
As stated in the section on reunification, DCF made reasonable and timely efforts to reunify the father with his children.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that, in accordance with federal law, DCF offered the father appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On October 31, 1997, the court entered the following expectations for the father to meet: 1) keep all appointments set by or with DCF; keep CT Page 9877 whereabouts known to DCF or your attorney; visit the children as often as DCF permits, 2) participate in individual and family counseling, 3) continue to take medications as prescribed, 4) secure and maintain adequate housing and income, 5) no substance abuse, 6) no involvement with the criminal justice system, and 7) continue to attend AA meetings. The father substantially complied with the expectations, read literally, concerning appointments with DCF, visitation, substance abuse, and AA meetings. The father did not substantially comply with the other expectations.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The children are strongly attached to their foster parents. Andrew and Sandra have some attachment to their father but have expressed varying sentiments about seeing him.
5) The age of the child.
At the time of trial, Andrew was ten years old and Sandra was almost nine.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the father did not adjust his circumstances in time to make it in the children's best interest to return to his home. The father regularly sought contact with the children but did not behave appropriately at visits.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the father's difficulties stem primarily from his own unwillingness and inability to address his rehabilitative needs and not from unreasonable interference by the mother or any third person, or CT Page 9878 from economic circumstances.
THE MOTION FOR REVOCATION
To prevail on her motion for revocation, the mother has the burden of proving by a reponderance of the evidence that the cause for commitment no longer exists. If she meets this burden, then DCF must prove by a preponderance of the evidence that it would not be in the best interest of the child to be returned to the mother. See Practice Book § 33-10.
The mother cannot meet her initial burden. Both the court-appointed evaluator and the mother herself believe that the mother cannot provide a home for the children in the immediate future. Hence a cause for the commitment of the children still exists, especially given the court's decision to terminate the father's parental rights and his unavailability as a resource. The mother's motion for revocation is accordingly denied.
THE MATERNAL GRANDPARENTS' MOTION TO INTERVENE
Both parents support the maternal grandparents' motion to obtain guardianship of their grandchildren. Andrew and Sandra visited their maternal grandparents for many years without incident and developed a close relationship with them. Based on this evidence and the other evidence, the court is satisfied that the maternal grandfather has rehabilitated from the incident in 1982 and that Phillip and Jean W. are now suitable and worthy potential guardians.
Although the grandparents attempted to stay involved in the case and maintain visitation with Andrew and Sandra, the grandparents were unsuccessful. As a result, the grandparents have not seen Andrew and Sandra since August, 1997. In the last year or so, the children have become closely attached to their current foster parents. Both foster families offer potentially permanent placements. Sandra has expressed a desire to be adopted by her foster family. The foster parents have proven especially skilled at addressing the children's special needs. Under these circumstances, it would be detrimental to the best interest of the children to tear them away from their current placements and place them with the maternal grandparents.
The court or DCF should nevertheless give full and fair consideration, keeping the findings of this court in mind, to the maternal grandparents in the event that one or both of the children's current foster families is not available as a permanent placement. Accordingly, the court denies the relief sought in the motion to intervene without prejudice to renewal in the event of an appropriate change in circumstances. The maternal grandparents shall remain in the case, if they so choose, as CT Page 9879 interveners. Further, DCF and the foster families should give the same level of consideration to visitation by the maternal grandparents. In general, this court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck, 209 Conn. 407,415, 551 A.2d 738 (1988).
CONCLUSION
Based upon the foregoing findings, the court hereby denies the termination petition against the mother, grants the termination petition against the father, denies the mother's motion for revocation, and denies without prejudice the relief sought in the maternal grandparent's motion to intervene.
It is so ordered.
 Carl J. Schuman Judge, Superior Court